STORM and others *v.* W. C. H. WADDELL, General or Official Assignee in Bankruptcy.

DE KAY *v.* THE SAME DEFENDANT, and S. MERRIHEW, Receiver, &c.

The commencement of a suit in chancery by a judgment creditor, whose execution at law has been returned unsatisfied, gives to him an equitable lien upon the things in action of the judgment debtor.

Such was the law of this state before the revised statutes went into operation. .

The adjudged cases, bearing upon the point, cited and examined.

The lien acquired by the creditor, is defeasible only by a discharge of the debt, or by a successful defence of the suit in some one of the very restricted modes open to the defendant.

The debtor cannot set up in such a suit, any defence to the original demand, on, which the judgment was recovered; nor any irregularity in its entry or in the execution; nor that the sheriff refused to levy on property, unless the creditor colluded with him in his misconduct.

A discharge of the debtor, in bankruptcy or insolvency, from his debts, pending the suit, does not operate to discharge or impair the lien acquired by the commencement of such a suit. The suit may proceed *in rem*, although the person and the future assets of the debtor may in the mean time be exonerated.

On an order being made for the appointment of a receiver in a judgment creditor's suit, and upon the appointment being completed, the property subject to the order vests in such receiver in equity, as of the date of the order, without the execution of any transfer or assignment.

In regard to movable property liable to execution at law, although it is subject to the lien of the creditor, it may be seised on execution by any other creditor, until the order for a receiver is made, but not afterwards; such order being equivalent to an actual levy on the property.

Where a debtor was declared a bankrupt under the act of congress of 1841, upon a petition filed after the commencement of a judgment creditor's suit against him in the court of chancery; it was *held*, irrespective of the proviso in the second section of the bankrupt act, that the assignee in bankruptcy took the debtor's things in action, subject to the creditor's lien acquired by the suit.

*Held* further, that the right of the judgment creditor in these cases, constituted a lien or security, within the meaning of the proviso in the second section of the act, and is protected thereby.

The word "*securities*," in that proviso, is used in its popular sense, and includes every interest or right attached to, or which is a charge upon, specific property, or which entitles the owner of such right or interest to be paid out of specific property; whether the right be legal or equitable, absolute or contingent.

The term "liens" in the same proviso of the bankrupt act, is not limited to mere common law liens which are lost whenever their owner parts with the possession of the property. It embraces all cases in which real or personal property is charged with the payment of any debt or duty, without regard to the possession of the property, or the legal or equitable nature of the duty imposed.

An assignee in bankruptcy may avoid an assignment executed by the bankrupt in fraud of his creditors, before the passage of the bankrupt law; but if a judgment creditor files a bill to set aside the assignment, before the proceedings in bankruptcy are instituted, and duly prosecutes his suit; he thereby acquires a lien which cannot be divested or impaired by the assignee in bankruptcy.

This was held in a case where the bill was filed, the subpœna to answer served, and the order for a receiver made, before the petition in bankruptcy was presented to the U. S. District Court; although no receiver was appointed until after the debtor was decreed to be a bankrupt.

The fund in controversy being in the custody of the officers of the court, it was ordered to be paid to the complainant in the creditor's suit, in preference to the general assignee in bankruptcy.

February 10, 11; July 15, 1845.

THE controversy in these causes, arose upon the claim made by the general assignee in bankruptcy in the city of New York, to receive the funds which had been discovered and secured in judgment creditors suits prosecuted in this court against sundry bankrupts. The complainants in the suits, resisted the claim, insisting that they had, by their respective proceedings, acquired a lien upon the funds, prior to the right of the assignee.

It was said at the hearing, that two or three hundred suits were to be affected by the result; and the question thus rendered very important, was the more difficult as well as interesting, in consequence of a decision already made upon the point, in favor of the general assignee, in the District Court of the United States sitting in this city.

In the first suit above entitled, the court at the hearing against the judgment debtor and his assignee, on holding the assignment made by the former to be fraudulent against his creditors; had directed the cause to stand over, so as to bring in the general assignee; it appearing that the debtor pending the suit, had obtained the benefit of the bankrupt act.(a)

---

(a) See the case reported, *Storm* v. *Davenport*, ante, Vol. I. page 135.

The cause now came on to be heard on the supplemental bill, and the answer of the general assignee claiming the whole fund.

The second suit above entitled, was one of interpleader, in which the debtor of one Glover a judgment debtor, attempted to settle the conflicting rights to the receipt of his debt, which were set up on the one hand by a receiver in a creditor's suit, brought by W. W. Chester and others against Glover, and on the other hand by the general assignee claiming under Glover's proceedings in bankruptcy. On filing his bill, the complainant in the second suit, paid the amount of his debt into court. Both the receiver and the general assignee, put in answers, each claiming the whole of the fund.

The details of the two cases will be found stated more at large in the opinion of the court. The two causes were heard in connection.

*E. S. Van Winkle,* for the complainants in the first suit.

*O. Bushnell,* for the receiver in the second suit, on the same side.

*B. W. Bonney,* for the general assignee in bankruptcy.

*J. Butler Wright,* for G. C. De Kay.

Mr. Van Winkle, made the following points:

1. By the assignment from Davenport to Burke, which was made before the passage of the bankrupt act, Davenport's interest in the assigned property was effectually divested, and that he could never set the assignment aside, it being fraudulent and void only as regards creditors. (*Osborn* v. *Moss,* 7 J. R. 161; *Mackie* v. *Cairns,* 5 Cow. 547.)

2. Although the assignee in bankruptcy, by virtue of the decree in bankruptcy, became the trustee for all the creditors of the bankrupt, yet that his rights only reach back to the date of the decree by the statute, and in the utmost to the filing of the petition, except in cases of fraudulent assignments and securities made or given subsequent to the passage of the act. (Act of

Congress, Aug. 19, 1841, § 3 ; *Ex parte John S. Foster*, 5 Law Reporter, 55 ; *Hutchins* v. *Taylor*, 5 ibid. 289.)

3. The rights of the assignee in bankruptcy are derived from the third section of the act, which merely gives the assignee the rights and places him *in loco* of the bankrupt at the date of the decree, and that the proviso in the end of the second section cannot be constructed to be a grant of all things not covered by it, but is and must be considered a special reservation by specification, of the things therein mentioned. (*In re Chadwick and Leavitt*, 5 Law Reporter, 457 ; *In re E. Horton*, 5 ibid. 462.)

4. But the claim of the complainant in this case is a lien or other security valid by the laws of this state and not inconsistent with the provisions of the 2 or 5 sections of the Bankrupt Act.

By the service of a subpœna and injunction under their judgment creditor's bill, the complainants obtained a lien or other security on the real and personal property of the defendant Davenport, within the meaning of the second section of the Bankrupt Act.

If not by the service of the subpœna and injunction, yet certainly the complainant obtained such lien or other security by the appointment of a receiver and an assignment to him before the petition in bankruptcy was filed. (*In re Muggridge*, 5 Law Reporter, 351 ; *In re Allen*, 5 ibid. 362 ; *Downer* v. *Brackett*, 5 ibid. 392 ; *Houghton* v. *Eustis*, 5 ibid. 505 ; also 5 Law Reporter, 423 ; *Kittredge* v. *Emerson*, 7 ibid. 312 ; American Law Magazine, No. 7, p. 312 ; *In re Coster*, 1 N. Y. Legal Observer, 53 ; Dwarris on Stat. 680, 690, 691, 697, 718, 725.)

5. Should the mortgage be declared to belong to the assignee in bankruptcy, the complainants are nevertheless entitled to a priority of payment of their costs out of the proceeds. (*Ex parte Foster*, 5 Law Reporter, 55, 74.)

Mr. Bushnell, for the receiver in the second suit, on the same side, presented the following points :

I. It has ever been the law in this state, that after a judgment creditor had exhausted his remedy at law, by the issuing and return of an execution *nulla bona,* he might file his bill in equity and obtain a lien on all the debtor's estate and effects. (*Spader*

v. *Davis,* 5 J. C. R. 280 ; *McDermutt* v. *Strong,* 4 ibid. 687 ; *Edmeston* v. *Lyde,* 1 Paige, 637.)

II. Since the revised statutes, there has been no doubt, if any existed before, that a valid equitable lien is obtained by filing a creditor's bill. (*Corning* v. *White,* 2 Paige, 567 ; *Utica Ins. Co.* v. *Power,* 3 ibid. 365 ; *Wakeman* v. *Grover,* 4 ibid. 23 ; *Grover* v. *Allen,* 9 ibid. 74.)

III. The Messrs. Chesters therefore, by filing their bill against Glover, obtained a valid equitable lien upon the property of Glover, by the laws of the state of New York ; a lien which is within the saving of the *second section* of the bankrupt act, which saves from the operation of the act, " *all liens, mortgages, or other securities, on property real or personal which may be valid by the laws of the states respectively.*" (5 Law Reporter, 505 to 507 ; *Houghton* v. *Eustis,* 5 ibid. 55, 392, 396 ; 7 ibid. 77, 81. The cases cited were the same as those by the preceding counsel, and also, *In re Rowell,* 6 ibid. 300 ; *In re Cook,* 5 ibid. 443 ; *Blanchard* v. ———, 5 ibid. 351 ; *Dudley's Case,* Penn. Law Journal, Nov. 1842, page 312.)

IV. The word lien in this connection, must be construed in its most enlarged and popular sense, and embraces all liens and securities on property *valid* by the laws of the states.

V. The Chesters then acquired an *equity lien, a superior equity,* which should be protected by the court sitting in bankruptcy. It is no longer a contingent or conditional right, but it has attached absolutely to the property, and by the laws of New York it remains a fixed and positive lien until the complainants judgment is satisfied. (*Lansing* v. *Easton,* 7 Paige, 364 ; *Waring* v. *Robertson,* 1 Hoff. Ch. R. 532 ; *Haxtun* v. *Bishop,* 3 Wend. 13 ; *Sea Insurance Co.* v. *Ward,* 20 ibid. 588.)

VI. By the appointment of a receiver which was before the bankrupt's petition, the Chesters through the receiver and in the name of the receiver, clearly became entitled to all the property of Glover. By the deed of assignment to him, the receiver obtained at law title to it, and could maintain an action for it.

VII. It is well settled, "*that in bankruptcy the general assignee takes only such rights as the bankrupt himself had and is subject to the like equities.*" (5 Law Reporter, 308 and 358,

per Story, Justice; 7 ibid. 82, per Chief Justice Parker; 6 ibid. 347, 352, and 444.)

Mr. Bonney, for the general assignee in bankruptcy, made the following points, in the first suit, and referred to the same as far as applicable in the second suit.

I. Upon the making of the decree of bankruptcy on the 25th February, 1843, all property and rights of property which were of the bankrupt Davenport, were, *ipso facto,* vested in defendant Waddell, assignee, &c., for the use and benefit of the creditors of said bankrupt. (Bankrupt Act of 1841, sec. 3.)

II. The said decree of bankruptcy takes effect, by relation, from the time of the filing of the original petition, and vests in the assignee all property and rights of property which were of the bankrupt when said petition was filed, on 24th January, 1843. (*Matter of Rust,* 1 N. Y. Legal Observer, 326; *Matter of Allen,* 5 Law Reporter, 362.)

III. The assignment made to Davenport by Burke, on 7th August, 1842, of the mortgage in question, was a fraud upon the said act and void as against the assignee, (Waddell,) who by virtue of such decree was entitled to claim and receive the same as part of the assets of the bankruptcy. (Bankrupt Act of 1841, sect. 2.)

IV. Neither at the time of the filing of the original petition in bankruptcy, (24th January, 1843,) nor at the time of the making of the decree of bankruptcy, (25th February, 1843,) had the complainants by their judgment creditor's bill or any proceedings thereon, acquired a lien or other security upon the said mortgage, valid by the laws of the state of New York, within the meaning of the last proviso of the second section of the bankrupt act, so as to entitle them (complainants) to the exclusive benefit of said mortgage as against the other creditors of said bankrupt, or against the assignee who represents all the creditors.

(The counsel cited under this, his principal point, in addition to many of the authorities mentioned by the opening counsel, the following, viz. : Bankrupt Act, § 2 and 5; 2 R. S. 173, § 38, 39; *Matter of J. H. Coster,* 1 N. Y. Legal Observer, 53; *Hadden* v. *Spader,* 20 Johns. 554; *Beck* v. *Burdett,* 1 Paige,

305; *Edmeston* v. *Lyde*, 1 ibid. 637; *Clarkson* v. *De Peyster*, 3 ibid. 320; *McElwain* v. *Willis*, 9 Wend. 548. He contended that the right acquired by a judgment creditor's bill had never been decided to be a lien in any of our state courts; that all that appeared in the books in favor of the proposition were *obiter dicta;* and that the whole proceeding was founded upon the revised statutes, and never existed before.

He also cited *Kittredge* v. *Emerson*, 7 Law Reporter, 312; *In re Bellows and Peck*, 7 ibid. 119; *Smith* v. *Gordon*, 6 ibid. 313; *Sylvester* v. *Reed*, 3 Edw. Ch. R. 296; *Mathews* v. *Neilson*, 3 ibid. 346; *Conard* v. *Atlantic Ins. Co.* 1 Peters, 386.)

V. This court having heretofore adjudged the assignment of the mortgage in question by Davenport to be void, and retained the cause for the purpose of settling the claims of the complainants and the assignee (Waddell) to such mortgage, may under this bill, decree the said mortgage to the assignee in bankruptcy and order its officer (the receiver) to assign and deliver the same and all proceeds thereof to him.

The court will make such decree in relation to costs as shall be equitable.

THE ASSISTANT VICE-CHANCELLOR.—The principal and most important question discussed in these causes, is presented in the most simple form, in the second suit. I will therefore consider it in the first instance, in reference to that suit.

The bill of De Kay is one of interpleader. He is the debtor of Glover, a bankrupt, and each of the defendants claims to be entitled to receive the debt. Mr. Merrihew is a receiver appointed by this court, in a suit commenced by Chester and others, judgment creditors of Glover, for the purpose of reaching his equitable interests and things in action; and founded upon the return of an execution at law against his property wholly unsatisfied. This creditor's bill was filed on the 28th day of October, 1842, and a subpœna to answer, accompanied with an injunction restraining the defendant from transferring his effects or doing any act to enable others to obtain a preference over the complainants, was served on Glover on the next day. On the 10th day of No-

vember, 1842, the usual order for the appointment of a receiver of the property and effects of the debtor was granted on motion, and entered in the minutes of the court; and on the 17th day of the same month, Mr. Merrihew was duly appointed such receiver, and executed the requisite bond. On the 30th day of November, Glover executed to the receiver a formal assignment of his property, pursuant to the directions of the order for a receiver.

The receiver claims to have obtained, by these proceedings, a lien upon the debt due from De Kay to Glover, and that the same must be applied towards the satisfaction of Chester's judgment and the costs of their creditor's suit.

The official assignee claims the same debt by virtue of a decree declaring Glover to be a bankrupt in pursuance of the act of Congress, entitled "An act to establish an uniform system of bankruptcy throughout the United States," passed August 19, 1841.

Glover's petition for the benefit of this act, was filed on the 23d day of November, 1842, in the District Court for the Southern District of New York, and he was decreed to be a bankrupt within the purview of the act, on the 24th of December following.

These conflicting claims must be determined by the nature of the right which Chester & Co. acquired in the things in action of Glover, by force of their creditor's suit in this court; and by the effect of the bankrupt act thereon consequent upon the petition and decree in the District Court in the matter of Glover's bankruptcy.

Without pausing here to inquire what was the effect, as to third persons, of the creditor's suit against Glover; I am confident no one who is acquainted with that proceeding as conducted in this state, will doubt but that as against Glover himself, Chester & Co. thereby acquired a right to the debt due from De Kay, which could only be defeated by a successful defence of their suit. This right thus defeasible, could not be divested short of payment of their demand. The defence which could be made to their suit, was very restricted. Their judgment was conclusive, unless fraudulently obtained; and no mere irregularity in its entry, or in the issuing or return of the execution, would avail the defendant Glover. Nor would he be permitted to show that the sheriff refused to levy on his property subject to execution,

unless he could also prove that Chester & Co. colluded with the sheriff in such misconduct. Unlike the ordinary case of a suit at law to establish and recover a debt, the debt of Chester & Co. was already proved by their judgment.

It thus appears that their right to the De Kay debt, upon exhibiting their bill, although defeasible, was no more likely to be defeated, than that of a mortgagee filing his bill to foreclose a mortgage; and the grounds of the defence, in the case of a mortgage are no more if as much restricted, as were those of Glover in the creditor's suit.

No subsequent act of Glover could defeat such right. If he had made an assignment to one ignorant of the injunction, or had procured a discharge from his debts under our insolvent law on the petition of two-thirds of his creditors; the assignee in either case, would have received the demand against De Kay, subject to the prior right of Chester & Co.

Did the bankrupt act and Glover's proceedings under it, impair or defeat this right?

And *first*, without reference to the proviso, which has been the subject of such able and elaborate arguments at the bar.

The third section of the act declares the rights of the assignee in bankruptcy. By force of the decree, all the property and rights of property of the bankrupt, (except such as should be allowed to him and his family by the assignee,) were divested out of the bankrupt, and vested in the assignee. And the latter was vested with all the rights, titles, powers and authorities, in respect of the same as fully to all intents and purposes, as the same were vested in or might be exercised by such bankrupt, before or at the time his bankruptcy was declared.

There is no other provision in the act on this point, which enlarges the title or interest of the assignee in respect of the demand now under consideration.

His right is therefore left to stand upon the general principle applicable to insolvency and bankruptcy, both in this country and in England, that the assignee takes only such rights as the insolvent or bankrupt had, and subject to all the equities which affect the assignor. (*Mumford* v. *Murray*, 1 Paige, 620; *Smith*

v. *Kane*, 2 id. 303; *Van Epps* v. *Van Dusen*, 4 id. 64; 2 Story's Eq. Jurispr. § 1411.)

Under the English bankrupt acts, this principle is qualified in certain instances, by relation to the time of the commission of an act of bankruptcy. But under the statutes of the various states, which are usually put in motion by the bankrupt or insolvent for his own relief, it is generally made applicable to the institution of the proceedings.

This view of the bankrupt act of 1841, has received the sanction of very high authority.

*In the matter of Muggridge*, in the first circuit of the U. S., New Hampshire District, September 12, 1842, (5 Law Reporter, 351, 358, and now reported, 2 Story's R. 334, *nomine*, *Parker* v. *Muggridge*,) Mr. Justice Story, says that if there had been no such saving in the act as the proviso in the second section, the liens, mortgages and other securities within the purview of the saving, would have been saved by mere operation of law, from the natural intendment of the statute, which did not mean to disturb existing vested rights and interests in property. Also that the property will be followed and affected with the trust in the hands of the assignees, in the same manner and to the same extent, as it would be in the hands of the bankrupt; citing several English authorities. He further says, "But if no such case ever existed, I should have no doubt, upon principle, that such ought to be the result. But there are many cases which stand on analogous grounds. We all know that in bankruptcy, the assignee takes only such rights, as the bankrupt himself had, and is subject to the like equities."

In *Mitchell* v. *Winslow*, in the Maine District, October, 1843, ( 2 Story's Rep. 630, and 6 Law Reporter, 347, 352,) the same eminent jurist says, " it is a well established doctrine, (except in cases of fraud,) that assignees in bankruptcy take only such rights and interests as the bankrupt himself had, and could himself claim and assert at the time of his bankruptcy; and consequently they are affected with all the equities, which would affect the bankrupt himself, if he were asserting those rights and interests." And the learned judge supports his position by a reference

to decisions from the time of Lord Hardwicke to that of Lord Lyndhurst, at law as well as in equity.

In *Windsor* v. *McLellan*, (2 Story's R. 493,) S. C., as the *Matter of McLellan*, (6 Law Reporter, 440,) in the District of Massachusetts, October, 1843, Judge Story re-affirmed the same doctrine in equally strong language. He says the assignee in bankruptcy takes the property "in the same plight and condition that the bankrupt himself held it, and subject to all the equities which exist against the same in the hands of the bankrupt." For further illustrations and applications of this principle by the same distinguished judge, see *Ex parte Newhall*, (2 Story's R. 360 ;) *Fletcher* v. *Morey*, (ibid. 555 ;) and *Fiske* v. *Hunt*, (ibid. 582.)

Although the policy of the act was to distribute the assets of the bankrupt equally, such policy was intended to apply to the rights and interests which he had, not to those which were vested in others while he still retained a qualified interest in the property. Aside from the proviso in the second section, there is nothing in the act which authorizes the inference that Congress intended to give such a monstrous and unprecedented effect to it, as to take away rights vested or acquired in good faith ; whether they were legal or equitable, express liens or constructive trusts. It is only from the time of the decree, that the property and rights of property are divested out of the bankrupt, and the act in distinct terms divests from him such rights as he has at the time of the bankruptcy and no more, and his assignee can enforce them as fully as he might at that time, and not otherwise. See upon this subject, the reasoning of the Supreme Court of New Hampshire, in *Kittredge* v. *Warren*, (7 Law Reporter, 77, 82 ;) and of Judge Betts in the *Matter of Brown*, (1 N. Y. Leg. Obs. 72.)

I leave out of view the distinction between a voluntary assignee of the debtor, and an assignee by operation of law, as in bankruptcy or insolvency. The latter may avoid the conveyances and transfers of the assignor made in fraud of his creditors which the voluntary assignee is incapable of doing ; but in the case of De Kay the difference has no bearing.

If then the assignee under the bankrupt act of 1841, took no other or greater right than Glover himself had at the time of his bankruptcy, it seems to me that there is an end of the question.

Before Glover filed his petition in the court of bankruptcy, Chester & Co. had acquired a right in the debt due from De Kay, and the debt itself had been divested from Glover, and vested in the receiver. His title to it was gone, and he retained no further interest in it, than this, that he might possibly defeat the suit of Chester & Co., and he might regain or redeem the debt by paying their demand.

His procuring a discharge in bankruptcy, would have no effect whatever upon the right which Chester & Co. acquired by their creditor's suit. It was *the property* of the judgment debtor, not a new judgment against him, which they sought by their bill. If they failed in discovering property, their suit would fail. Thus their proceeding was against the specific effects, not the person of Glover; and if available, would become so by force of the discovery of such effects existing at the time of filing their bill. On such effects, they obtained a vested right for payment, and a subsequent discharge of their debt by operation of law, could not divest that right.

In De Kay's case, it makes no difference whether the right by the creditor's suit vested on the service of the subpœna, or on the order for, or appointment of the receiver. There is no occasion to go beyond the appointment, because by force of the order and appointment, (if not by the order alone,) Glover's right in the debt of De Kay was transferred to the receiver. The execution of the assignment to the receiver gave to him no new right. Such assignment is convenient to establish a legal title, and has become customary in these suits; but it is the order of the court which works the transfer of the right of the judgment debtor.(a)

SECOND. These causes have been fully argued upon the effect of the proviso in the second section of the bankrupt act. And perhaps the creditors stand stronger upon the proviso, than they do upon the general principle which I have discussed. It is therefore proper that I should consider the question as it is presented in this aspect.

The proviso is in these words: " And provided also, that no-

(a) See to this effect, *Mann* v. *Pentz*, ante, page 257.

thing in this act contained shall be construed to annul, destroy or impair any lawful rights of married women, or minors, or any liens, mortgages, or other securities on property, real or personal, which may be valid by the laws of the states respectively, and which are not inconsistent with the provisions of the second and fifth sections of this act."

It is not alleged that there is any thing in the second or fifth sections of the act, which militates against the receiver's right to the benefit of this provision, if it be brought within its terms. But it is strenuously contended on the part of the official assignee, that the right which the receiver represents, *is not such a lien or security, valid by the laws of this state ; as comes within the saving clause of the bankrupt act.*

*First.* What is the meaning of a lien or security on property, real or personal, in this proviso ?

The terms used are not synonymous, nor is it to be supposed that Congress would load a statute with words purely superfluous. The word *security*, is the most general term, and in its usual acceptation embraces liens as well as mortgages. But it is not a legal phrase. It signifies, *that which makes secure or certain ;* in its proper use it relates to pecuniary matters ; and often consists of a promise or right not attended with possession of the thing upon which it reposes. It implies, in its common acceptation, that which prevents loss, or makes safe. Dr. Johnson defines it as, "any thing given as a pledge or caution." Dean Swift used it as synonymous with "safety, certainty." Dr. Webster gives us six definitions of the word, one of which is, "safety, certainty," and another is, "Any thing given or deposited to secure the payment of a debt, or the performance of a contract ; as a bond with surety, a mortgage, the indorsement of a responsible man, a pledge, &c."

It is not to be found in the old law dictionaries. Bouvier, defines it as *that which renders a matter sure ; an instrument which renders certain the performance of a contract.* (2 Bouv. Law Dict. 493.)

I have no doubt that the word *securities* in this proviso was used in its popular sense. Congress had provided in the words which precede it, for *liens* and *mortgages,* the former, a very

comprehensive term of itself; and the generic term *securities* was added to sweep into the proviso, every other vested right which was attached to, or was a charge upon property.

These terms are to be construed in a liberal and enlarged sense. Else what becomes of the very numerous rights in property, which are known as *privileges* in the state of Louisiana? No such legal word as *lien*, is known to the laws of that state, and there *mortgages* are a distinct class of interests. The literal words of the proviso, leaving out of view "other *securities*," viz., *liens and mortgages on real or personal property*, convey but little of their intent, in a state where liens, as such, are unknown, and where no property is recognized as being real or personal. Without going more minutely into this discussion, I will say at once, that the term "*securities*" in the bankrupt act, in my view, includes every interest or right, attached to or which is a charge upon specific property, or which entitles the owner thereof to be paid out of specific property; whether legal, or equitable, absolute or contingent.

In the *Matter of Muggridge*, before cited, (5 Law Reporter, 351; 2 Story, 334;) Judge Story treats the proviso in the manner which I have attempted to illustrate, and he upheld a right in property as founded upon a contract, because it created an equitable lien or security, or a constructive trust in the property; and gave to the claimants a superior equity therein to that of the general creditors represented by the assignee.

The word "*lien*" is of well known signification.

In law, it signifies an obligation, tie or claim, annexed to, or attaching upon any property; without satisfying which such property cannot be demanded by its owner. (4 Jacob's Law Dict. by Tomlins, 159.)

In a late law dictionary it is thus defined : "In its most extensive signification, this term includes every case in which real or personal property is charged with the payment of any debt or duty ; every such charge being denominated a lien on the property. In a more limited sense, it is defined to be a right of detaining the property of another until some claim be satisfied." (2 Bouvier's Law Dict. 54.)

In the every day use of the term, *liens* include mortgages, as

well as the more restricted interests which one may hold in the property of another. And I think there is no doubt but that its usual and accepted meaning is quite as extensive as the definition of it which I have given from Tomlin's Jacob.

There is no reason to suppose that Congress intended to limit the proviso to common law liens, which exist only where the party entitled to it has possession of the goods, and which are lost whenever he parts with the possession. This is one of the smallest classes of liens known to our jurisprudence. There are numerous statutory liens, and liens by the maritime law, some of which require possession to accompany them, while others exist independent of possession. And besides these, there are the diversified liens in equity, some with, and more without, regard to possession of the property; which as is said by Judge Story, are rather deemed a charge upon the thing, than either a *jus in re* or a *jus ad rem*. I refer for instances of equitable liens to 1 Story's Eq. § 506; 2 ibid. § 1215 and succ.; and § 1411.

Nor do I find any distinction in the proviso, between absolute and conditional liens. Although the latter may be defeated by the condition, they are nevertheless liens, until the contingency happens.

In the *Matter of Coster*, (1 N. Y. Legal Observer, 53, 54,) the learned judge of the U. S. District Court in the Southern District of this State, said that the word *lien* has been understood and expounded here as used in a familiar sense, and as comprehending all privileges and charges upon the thing, recognized by local statutes, long established usages, or the general law; and that in his judgment, the word lien in the bankrupt act, imported any *charge* fixed by law upon the property, or imposed by the party, in consonance with existing laws and usages. And see the *Matter of Allen*, (5 Law Reporter, 362,) in the Northern District Court, per Conkling, J.

I have already mentioned *Parker* v. *Muggridge*, (5 Law Reporter, 357; 2 Story, 334;) where Judge Story decided that an equitable lien is as much within the act as a legal lien; and gave effect to a trust or security, which was such by operation of law. (See also his observations in *Ex parte Foster*, 5 ibid. 62;

2 Story's R. 131 ; and the case of *Kittredge* v. *Warren*, 7 ibid. 82.)

In *Downer* v. *Brackett*, (5 Law Reporter, 394,) Judge Prentiss of the U. S. District Court in Vermont, said that in common acceptation, *lien* is understood and used to denote a legal claim or charge on property either real or personal, for the payment of any debt or duty. By *legal*, I understand the learned judge to mean, lawful or recognized by law ; and in that sense his definition embraces all the classes of liens which I have mentioned.

And in *Houghton* v. *Eustis*, (5 ibid. 507,) in the U. S. Circuit in the same District, that eminent judge the late Mr. Justice Thompson, said that in his opinion it was the purpose of the bankrupt act to preserve all the securities upon property, which although unknown to the common law, are by the laws of the respective states as essentially a lien upon the property, as those existing at common law.

Under the English system of bankruptcy, the variety of *liens and securities* which are respected in its administration is very great. (See Archbold's Bankruptcy, by Flather, 139 to 147 and 149.) And so far is the striking of a docket from cutting off such liens, or driving the creditor having a legal lien into the bankrupt court to enforce his claim, that it is held that the court has no jurisdiction in bankruptcy against a creditor who obtains execution before the bankruptcy, unless he voluntarily comes in under the fiat. (*Ex parte Botcherley*, 2 Glyn & J. 367.)

The liens and securities in the saving clause in the second section of the act, are such as *may be valid by the laws of the states respectively*. They are not restricted to such as are created by the statutes of the states, but I apprehend, include all liens and securities known to the municipal law of the states, whether they are cognizable at law, in equity, or in admiralty. In this respect the bankrupt act, in the language of Judge Ware, adopts the laws of the states respectively ; and in this instance as in others, we are to ascertain what those laws are, by the statutes of the states and their judicial rules and decisions.

I am aware that the Supreme Court of the United States have held that where a question arises, which is governed by the general principles and doctrines of commercial jurisprudence, they

will not be controlled by the *judicial decisions* of the courts of
the state where the question arose. (*Swift* v. *Tyson*, 16 Peters,
1.) But this is wholly different from the usage of that court in
questions growing out of real estate, and others of a local charac-
ter; and I suppose the departure from that usage was on the
ground that a question of commercial law turned, not upon the
law of any one state, or of the United States, but upon the law
merchant of the whole commercial world.

For further illustrations of this subject, I refer to the *Matter of
Coster*, before Judge Betts, cited above; *Smith* v. *Gordon*, (6
Law Reporter, 313,) per Ware, J. in the U. S. District Court in
Maine; *Matter of Muggridge*, (5 ibid. 351, and 2 Story, 334,)
before cited; *Matter of Allen*, (5 ibid. 362;) *Downer* v. *Brack-
ett*, cited above, (5 ibid. 392;) *Houghton* v. *Eustis*, (5 ibid. 505;)
and *Dudley's Case*, (1 Penn. Law Journal, 308,) in the U. S.
Circuit Court, per Baldwin, J.

The next inquiry is, whether by the creditor's suit in this case,
Chester & Co. acquired a *lien* or *security* on the judgment
against De Kay, according to the laws of this state. In other
words, did their suit create a charge upon that thing in action,
which entitled them to payment before the bankrupt could re-
sume or dispose of it?

The practice of filing bills in this court by unsatisfied judg-
ment and execution creditors, to reach the things in action of the
debtor, which has become so well established and familiar, is
usually referred to the revised statutes as its origin. (2 R. S. 173,
174.) The statute is undoubtedly sufficient to sustain all the
argument that was presented in support of the effect of such a
suit; but as I desire to refer to cases prior to the time when the
revised statutes went into operation, I will advert briefly to the
earlier history of this jurisdiction.

The power of the Court of Chancery to aid the creditor in
removing fraudulent impediments in the way of levying on the
personal property liable to execution, or selling the real estate of
his debtor; is an old established ground of jurisdiction, which is
not in question here. The bill in those cases was auxiliary to
the carrying into effect the process of the law courts, and differed

from our creditor's suit now under consideration, in this, that in the suit to set aside a fraudulent conveyance of land, so as to give effect to a judgment, the bill need not allege any thing more than the recovery of the judgment, and where it was to remove an obstruction affecting movable property, it was only requisite to allege an execution issued to the county where the property was situated; while in the creditor's bill against equitable interests and things in action, the creditor must show the issuing of an execution and its regular return unsatisfied.

In the case of *Spader* v. *Hadden*, (5 J. C. R. 280,) Chancellor Kent, in 1821, sustained a creditor's suit of the description now in use, against monies in the hands of Hadden, which arose from property transferred to him by the debtor, the transfer being fraudulent against creditors. This decree was affirmed by the Court for the Correction of Errors in November, 1822; (20 Johns. 554.) A majority of the court concurred with Chief Justice Spencer and Mr. Justice Woodworth, (the latter delivered the prevailing opinion,) in holding that the case was one of acknowledged equitable cognizance. And the reasoning of the judge is applicable as well to the case of the funds being in the debtor's hands, as to the case decided.

It is true that in *Donovan* v. *Finn*, (Hopkins' R. 59, 77,) decided in November, 1823, the Chancellor omitted to follow the result of the decision in *Hadden* v. *Spader*, and viewed the latter as a case of trust and fraud. But I submit with great respect, that there was much more in the decision than was acceded to it in *Donovan* v. *Finn*. The goods assigned in *Hadden* v. *Spader*, were sold and converted into money, five months before Spader recover his judgment, so that there was no property on which his execution could have become a lien. It was then the plain case of a debtor having things in action in the hands of a third person ; and equity deemed it unjust that either the one or the other should withhold them from the payment of his creditors.

The doctrine of *Donovan* v. *Finn*, has not been followed in any case since, nor so far as I have seen, approved by more than two judges. There is abundant evidence that it was not deemed in accordance with the decision of the highest court in *Hadden* v. *Spader* ; and aside from the books, I know from my own

practice, that it was disregarded prior to the time of the revised statutes. In the following cases, the contrary was decided, or opinions to that effect given.

In *Weed* v. *Pierce*, 9 Cowen, 722, 727, decided by Chancellor Walworth, when Circuit Judge, sitting in equity, December, 1827; *Beck* v. *Burdett*, 1 Paige, 305, January, 1829; *Candler* v. *Pettit*, 1 ibid. 427; affirmed on appeal in December, 1829, 3 Wend. 618, 621, 625; and *Edmeston* v. *Lyde*, 1 Paige, 673, November, 1829; In *Wakeman* v. *Grover*, 4 Paige, 23, affirmed 11 Wend. 187, the bill was filed in 1828, to reach the things in action assigned as well as the goods of Grover and Gunn, and the decree was made against both species of property without discrimination, although the case was most desperately contested throughout. The Chancellor repeated the doctrine of the above cases at page 33 of 4 Paige. And as recently as in 1844, he reiterated it in *Farnham* v. *Campbell*, 10 Paige, 601.

See also the revisers notes in introducing the provisions on the subject, which are contained in the revised statutes. (3 R. S. 669, 2d ed.)

I may therefore assume, that by the law of this state as settled more than twenty years before this case arose, an unsatisfied execution creditor had a right to file a bill in this court to compel payment of his debt out of the equitable interests and things in action of the judgment debtor.

I will now endeavor to show what is the effect of such a bill, when filed and duly prosecuted.

Before filing it, the creditor must have obtained a judgment, or a decree for the payment of money, issued his execution against both the real and personal property of his debtor, and had it actually returned and filed. And he must state in his bill under oath, that the sum claimed upon his judgment or decree, is due to him, over and above all claims of the debtor by way of offset or otherwise. This makes a case, which leaves little room for contingency or uncertainty in the result of the suit, so far as the complainant's debt is concerned. His cause of action must be upon the records of some court of law, which of themselves are evidence of the existence of the debt.

Upon filing the bill, an injunction is taken out and served with

the subpœna to answer, restraining the debtor from parting with any of his property or effects till the farther order of the court. And for the better protection of the property, and its conversion into money, a receiver is speedily appointed, who under the order of the court, is vested with all such property, (or with sufficient specific portions of it, to pay the complainant's debt and costs, and all prior claims upon the same,) and the debtor is compelled to assign and deliver such property to the receiver under the direction of a master of the court.

Unless the defendant can make a defence on some one of the very narrow grounds open to him, the decree presently ensues, which directs the receiver to pay to the complainant out of the fund in his hands, the judgment with interest, and the costs of the suit.

If there are several creditor's suits, each complainant is paid according to his priority, as ascertained by the time of the filing of the respective bills and serving the process to answer.

This is an epitome of the course of proceeding. Without regard to the injunction, the property of the defendant is subjected to the suit, wherever it may be, if the receiver can lay hold of it, or the complainant can reach it by the decree. The injunction, when served, prevents the debtor from putting it away or squandering it.

The suit does not affect property acquired by the debtor after its commencement. A supplemental bill, or a proceeding of the like nature, is necessary to subject such property to the debt.

A receiver is a convenient and important, but not indispensable part of the proceeding. The effects locked up, as it were, in the hands of the debtor by the injunction, may be decreed to be delivered to the complainant, or sold by a master and applied in satisfaction of the debt and costs.

No voluntary assignment of the debtor can impair the complainant's right, nor any intervening claim of other creditors.

I speak in this outline, of equitable interests and things in action. Other personal property will be noted hereafter. And as to lands, I need only say, that the court acts upon the rents and profits, where the legal title or the right to the possession is in the debtor.

It is conclusive to my mind, that the right thus acquired by the creditor, is a *charge* upon the things in action which the debtor had at the commencement of the suit. It is so far contingent, that it may possibly be defeated, by the event of the suit; although in this respect, the result is unmeasurably more certain, than in the suits by attachment in our sister states for the collection of ordinary debts. And except on this contingency, it is an absolute claim, to be divested only on satisfaction of the debt and the costs of the suit. It is just as certain and effectual upon the effects discovered, as a mortgage or judgment is upon the lands thereby incumbered.

If I am right in this result, Chester & Co. had a lien or security upon the property in question, which was within the proviso of the bankrupt act.

This conclusion is strongly fortified by the course of decisions in this state, and the language of our equity judges.

In *McDermutt* v. *Strong*, (4 J. C. R. 687,) the right was upheld as *a lien* upon the equitable interest sought by the bill.

The argument of the appellant's counsel in *Hadden* v. *Spader*, was upon the ground that the creditor *must establish a lien*.

In *Weed* v. *Pierce*, (9 Cowen, 728, 729,) Chancellor Walworth held that the creditor in a bill of this kind, acquired a *specific lien* upon the fund by the commencement of his suit.

In *Beck* v. *Burdett*, (1 Paige, 305, 309,) he declared his opinion, that the filing of a bill, after the return of an execution at law, gave to the plaintiff a *specific lien* on the fund or property not liable to execution at law; but the execution not having been returned in that case when the bill was filed, the Chancellor dismissed the suit.

In *Edmeston* v. *Lyde*, (1 ibid. 639, 640,) the same opinion is repeated by the Chancellor.

The foregoing cases were before the revised statutes.

In *Eager* v. *Price*, (2 Paige, 333, 338,) Chancellor Walworth held that by filing a judgment creditor's bill, the creditor acquired a *specific lien* on the property which the debtor had at the commencement of the suit, but that a supplemental bill was necessary to obtain a lien upon after acquired property of the debtor.

In *Corning* v. *White*, (2 ibid. 567,) the debtor set up in his an-

swer that there were other unsatisfied execution creditors. The Chancellor overruled the defence, and held that the creditor who first files his bill obtains a preference. He says, "The filing of the bill here under the provisions of the revised statutes, *operates as an attachment of property which cannot be levied on at law.* It gives to the vigilant creditor a right to a priority in payment, and the creditor who next files his bill, *will have the second lien.* An assignment under the insolvent acts, after the commencement of the suit, only gives to the assignee a right to the surplus, after the payment of the complainant's debt."

In *Clarkson* v. *De Peyster*, (3 Paige, 320,) the Chancellor on holding that a creditor might file a bill of this description founded on a decree in equity, again speaks of the right acquired under it, as *an equitable lien.*

In *The Utica Insurance Company* v. *Power*, (3 ibid. 365,) the Chancellor declared that by the creditor's suit, the complainants acquired a *specific lien* on the demand in question.

*Bloodgood* v. *Clark*, (4 Paige, 574,) was a case upon the appointment of a receiver, in which the Chancellor in support of a speedy appointment, says in effect, that the sworn bill of the complainant shows presumptively that he has an equitable right to all the funds and property of the defendant to satisfy his debt. In *Ames* v. *Blunt*, (5 Paige, 13, 24,) he again speaks of the bill as giving to the complainant *a lien* on the property in controversy.

In *Burrall* v. *Leslie*, (6 ibid. 445,) where eight creditor's bills had been filed against the same judgment debtors, before the Chancellor and different Vice-Chancellors, there had been a reference to a master under the Chancellor's order to settle the creditors priorities, and they were reported to be entitled, in the order of their respective suits. The Chancellor made a decree accordingly.

This case, with *Corning* v. *White*, shows that the *lien* obtained by these bills, is not a mere form of words, or operative only against the debtor. As between the creditors, it overrules the equitable principle of equality, in thus rewarding superior vigilance.

In *Lansing* v. *Whitbeck*, (7 Paige, 364,) which was much

relied on by the counsel for the assignee as showing an inconsistency in the doctrine contended for, the Chancellor held that in regard to *chattels liable to execution at law*, the title of the defendant was equitably divested by an order for its sequestration or for the appointment of a receiver ; and that although by the creditor's bill, the complainant acquired *an equitable lien* thereon, yet before such order, that lien would not be protected against the *legal right* obtained to it by another creditor who levied upon it an execution at law. The same doctrine as to the force of such a levy is repeated in *Storm* v. *Badger*, (8 ibid. 130.)

Whatever may be the true grounds of the rule, it does not affect the force of the lien of a creditor's suit, upon *equitable interests and things in action.* In the absence of an authoritative exposition of the reasons, I submit that the decision may be upheld on the following. The object of these suits is to remedy the defect of legal process in the collection of debts. There is no difficulty in obtaining satisfaction out of the chattels of the debtor, in ordinary cases, by sale on execution. And the creditor who first levies his execution on such chattels, is entitled to a priority by his greater vigilance. The effecting of such a levy, indicates that the remedy at law was not imperfect, and as that is the principal remedy, and the one in equity is ancillary, the former should take precedence, so long as the possession and title remain in the debtor. But when the proceeding in equity, by an order for a receiver or otherwise, has made what is equivalent to an actual levy in behalf of the suitor in this court, he is then the vigilant creditor and obtains the prior lien.

The case of *Grosvenor* v. *Allen*, (9 Paige, 74,) arose under the statute which subjects the interest of persons holding contracts for the purchase of lands, to the same proceeding in this court as the creditor's suit, upon an execution being returned unsatisfied. (1 R. S. 746, § 4, 5.) Nothing is said in the statute relative to priority or lien. The Chancellor decided that neither the judgment or execution, constituted a lien upon the debtor's interest under such a contract, but he says that the commencement of a suit in this court under the statute, would give to the creditor an equitable lien thereon.

In *Lentilhon* v. *Moffat*, (1 Edw. Ch. R. 451, 466,) Vice-Chancellor McCoun said the complainants had "acquired a *lien* to the amount of their judgments," by their creditor's suit which he was then deciding.

In *Tuthill* v. *Lupton*, (1 ibid. 564,) in denying a motion of the defendant to be permitted to use a portion of his effects in order to defend the creditor's suit, the Vice-Chancellor said, "the complainant has acquired a *prima facie lien* on this money, and the defendant must rely upon his subsequent earnings for the means of making his defence."

In *Albany City Bank* v. *Schermerhorn*, (1 Clarke's Ch. R. 297,) Vice-Chancellor Whittlesey held that the filing of a creditor's bill created a *lien* upon the things in action and equitable assets of the judgment debtor. In *Boynton* v. *Rawson*, (1 ibid. 584, 589, 594, 595, 596,) V. C. Whittlesey repeated the doctrine that the creditor's suit creates such a *lien*, and decided that as between different creditor's suits, the one in which the subpœna to answer is first served, has priority.

Certain cases in our own courts, were mentioned as containing a different doctrine, to which I will now refer. *White* v. *Carpenter*, (2 Paige, 217, 242, &c.) was not a creditor's suit; and the point of the decision was that an equitable lien on specific property, has preference over the general lien of a subsequent judgment.

The Chancellor's expressions in *Osborn* v. *Heyer*, (2 Paige, 343,) merely show that although the receiver obtains the assets in a creditor's suit, it may turn out that there are prior equitable claims which are paramount to those of such creditor. *Lansing* v. *Easton*, (7 ibid. 364,) I have already mentioned.

In *Sylvester* v. *Reed*, (3 Edw. Ch. R. 296,) and *Mathews* v. *Neilson*, (3 ibid. 346,) the Vice-Chancellor refused to revive a creditor's suit against the administrators on the death of the debtor, on the ground that the statute regulating the distribution of the estates of decedents requires the payment of all judgments alike without preference. At the same time, the learned judge expressly declared that the creditor's suit created an equitable lien upon the property of the debtor. But he supposed that such

a lien is not entitled to the same consideration under the statute of distributions, as a lien at law accompanied by possession.(*a*)

Without discussing that position, it suffices to say that the Vice-Chancellor treated the creditor's right as being a *lien*. And in *Smith* v. *Bleecker*, decided by him since the causes before me were heard, (MS. May 27th, 1845,) he overruled a plea of a bankrupt's discharge and assignments, in a creditor's suit, where the petition in bankruptcy *preceded a few days, the filing of the bill*. I can only speak from a newspaper report of the decision. If that be correct, the V. C. held that the creditor acquired by his suit, a lien in equity which could not be divested by the subsequent decree in bankruptcy; and that the latter took effect from its entry, and not by relation from the time of filing the petition in bankruptcy.

In the United States courts within this state, we have conflicting decisions on the question.

In *Ex parte the General Assignee, In re Allen*, and several others, bankrupts, (reported in 1 N. Y. Legal Observer, 115, and 5 Law Reporter, 362,) Judge Conkling of the Northern District, decided that by the institution and diligent prosecution of a suit by a creditor's bill, the complainant acquired a lien on the debtor's property, which was not divested by a decree of bankruptcy entered on a petition filed after the commencement of such suit. The opinion of the learned district judge is familiar to the profession, and I need not say more of it than that it is distinguished by its directness and ability, and is to my mind conclusive.

On the other hand, Judge Betts of the Southern District, a jurist of more experience and certainly of no less learning than the other, and whose judgments have always commanded the entire respect and general assent of the bar, decided directly to the contrary, in *Ex parte Waddell the General Asignee, In re Coster*, (1 N. Y. Leg. Obs. 53.) The petition was filed by Coster after the commencement of the creditor's suit, but before the order for a receiver.

(*a*) See on this point a similar decision, *Jones* v. *Smith*, (1 Walker's Ch. R. Michigan, 115.)

As I am constrained to differ from the judge of the Southern · District, it is due to the high regard which I entertain for him, that I should say that I think his decision is made under an erroneous impression in respect of creditor's suits, which have grown up since he left the bar, and with which his judicial career has never brought him into direct contact.

Thus, although until the property of the debtor is discovered, the lien must, as he says, be apparently floating and in abeyance, it is in this respect no different from the lien of a judgment upon lands, or an execution upon goods, until such lands or goods are discovered. But like the latter when levied, and unlike the judgment, the lien by the creditor's suit becomes *specific*, upon such assets as are discovered. And again, unlike the general lien, it does not affect after acquired property.

The power to prevent a transfer of the property by the defendant, does not follow or depend upon the discovery of the property. In practice, it always precedes the defendant's appearance, the injunction being taken out with the subpœna ; and its object is to prevent the defendant from disposing of the property and thereby defeating the lien. And lastly, although as the judge remarks, the fund is subjected by the court, to the *equitable rights of all parties*, yet it therein resembles every other fund which comes within the jurisdiction of the court ; and as between different claimants by creditor's suits, is as we have seen, disposed of according to the priority of such suits as shown by the order in which they were commenced.

Thus it will be observed, that although our state courts have uniformly treated the rights in question as a *lien*, and that at all events, it must be deemed a *security*, yet we have no authoritative decision upon the point ; and the learned judges of the U. S. District Court disagree in opinion.

The remedy against things in action by a suit in equity is not established in many of our sister states.

It prevails in Kentucky by force of several statutes, the first of which was passed in 1821, (1 Kentucky Dig. 505,) and I find a decision of the Court of Appeals in that state, which is directly in point.

In *Fetter* v. *Cirode*, (4 Ben Monroe's R. 482,) Cirode and

others, about eighteen months before the passage of the bankrupt law, having several judgments against T. McGruder and others, filed their bill in chancery, to set aside as fraudulent, various conveyances and transfers made by the debtors, and to subject the property transferred and the proceeds of such of it as had been sold, to the payment of their demands. During the progress of the suit, which was vigorously prosecuted, T. McGruder was discharged from his debts, under the bankrupt law, and then set up his discharge in an amended plea and answer. The Court of Appeals, affirming the decision of the Chancellor, held that the effect of the discharge was to exonerate T. McGruder from a decree *in personam*, but that it did not discharge the property and things in action specifically sought to be subjected to the complainants demands, from liability to their suit. The court held that by the bill, the service of process and pendency of the suit, a lien attached in favor of the complainants, upon the effects sought to be subjected, which was not divested or ousted by the statute.

It should be remarked, that in *Newdigate* v. *Jacobs*, (9 Dana's R. 17,) the same court in 1839, declared that the commencement of the creditor's suit in equity, constituted a lien in his favor upon the debtor's effects subject to the operation of the suit.

A reference to analogous cases and decisions confirms my conclusion, that the receiver and not the general assignee, is entitled to the fund in question.

Many of these have arisen under the statute laws of various states, authorizing the issue of attachments, &c., as mesne process for the collection of debts.

In some of these statutes, the attachment is denominated *a lien*, while in others which give to it the same operation, the word *lien* is not used.

It appears to me that the use or omission of that word cannot be essential, and that the operation and effect of the process, is to determine whether it constitutes a lien or security.

In *Downer* v. *Brackett*, (5 Law Reporter, 392,) Judge Prentiss, in the U. S. District Court in Vermont, held that an attachment, commencing a suit for the recovery of a debt not in judgment, and which was levied on goods, was a lien within the provision of

Storm v. Waddell.—De Kay v. Waddell.

the bankrupt law. The judgments in that case, were confessed by the debtor before the petition in bankruptcy was filed. Nevertheless the argument of the learned judge, goes the whole length of holding that the attachment, irrespective of the judgment, constituted a lien.

In *Haughton* v. *Eustis*, (5 ibid. 505,) in the U. S. Circuit Court in the same district, the petition in bankruptcy intervened after the issuing and levying of the attachment and before the rendition of the judgment; and it was decided by the late Mr. Justice Thompson, that the attachment constituted a lien and security, within the meaning of the proviso in the second section of the bankrupt act. He says, the attachment by the laws of that state was a security upon the property attached, " a security valid as against the world, and indefeasible, excepting by the attaching creditor, up to the rendition of the judgment." "If he recover, the judgment must be satisfied, *pro tanto*, out of that property." In regard to the objection that the security upon the property attached is contingent, the judge says, it is no more contingent than a lien by mortgage. Liens are necessarily defeasible and thus contingent. When the right becomes absolute, it ceases to be a lien.

The two cases last cited, are entitled to the more weight, because the petitions in bankruptcy were presented by creditors, and an involuntary decree was made against the bankrupt in each case. It was the petitioning creditors there who urged the doctrine that "equality is equity ;" not the debtor, who after driving his creditor to exhaust all remedies at law and to the extreme of filing a bill in equity, then files his voluntary petition in bankruptcy and seeks thereby to overreach the whole proceeding, and deprive the creditor of the fruits of his superior vigilance, and mulct him in the payment of the expenses which he has incurred.

*In the matter of Rowell*, (6 Law Reporter, 298, and 2 N. Y. Leg. Obs. 283,) and in the *Matter of Reed*, (3 N. Y. Leg. Obs. 262,) Judge Prentiss adhered to his opinion pronounced in *Downer* v. *Brackett*.

In *Kittredge* v. *Warren*, (7 Law Reporter, 77,) the Supreme Court of New Hampshire in a very able judgment pronounced by Chief Justice Parker, decided that an attachment of property

on mesne process, made in good faith, before any act of bankruptcy or petition by the debtor, is a lien or security upon property, valid by the laws of that state, and therefore within the proviso of the second section of the bankrupt act.

In *Kittredge* v. *Emerson*, (7 ibid. 312, and 3 N. Y. Leg. Obs. 166,) the same court reviewed its decision in Kittredge and Warren, and re-affirmed it. The argument of the Chief Justice in both cases, is marked by sound learning and close and logical reasoning. It not only fully sustains the ground which I have assumed in regard to creditor's suits, but goes far beyond it; for it sustains the suit by attachment, *in rem*, when it can no longer operate to effect a judgment *in personam*. In the creditor's suits, we set out with a judgment *in personam*. The attachments in New Hampshire were suits in assumpsit upon simple contract. A similar decision has been made in the U. S. District Court of Vermont. (See *In re Reed*, 3 N. Y. Leg. Obs. 264.)

In *Dudley's Case*, before the late Mr. Justice Baldwin, in the Circuit Court of the United States, in the Eastern District of Pennsylvania, October 31, 1832, (Penn. Law Journal, 302, 312, 315, 318,) after Dudley had presented his petition in bankruptcy and before a decree could be made, several executions were issued on judgments previously obtained, and were levied upon his property. The Circuit Court refused to interfere, and held that the property of the petitioner was not divested until a decree in bankruptcy has passed, and until then, is subject to execution. Judge Randall of the the U. S. District Court in that District, had previously ruled the same in *Ex parte Bennet*, (Penn. Law Journal, 1845,) and his decision was confirmed in *Dudley's Case*. In the course of his decision, Judge Baldwin illustrates his position by reference to attachments on mesne process, which he considers as valid liens.

In the *American Exchange Bank* v. *Morris Canal Company*, (6 Hill's R. 366,) the Supreme Court held that in our pro ceeding by attachment against foreign corporations, the creditor has a lien on the property attached, from the time of its seizure, and not merely from the time of the recovery of the judgment.

The case of *Dove* v. *Dawson*, (6 Alabama Rep. N. S. 712,) was one where a promissory note was attached on a garnishee pro-

cess. It was decided that the attachment was a lien upon the note, and held it as against a subsequent *bona fide* purchaser without notice of the attachment.

In *Kilborn* v. *Lyman,* (6 Metcalf, 299,) decided in May, 1844, the Supreme Court of Massachusetts declare that attachments in that state have been treated and considered as liens from a very early period; having attached to them their peculiar character of conditional liens, and liable to be defeated by various contingencies which may prevent any recovery of judgment or levy of execution. The court refers to its decision in the case of the *Receivers of the Phœnix Bank* v. *The Hamilton Bank,* (Suffolk, March Term, 1844,) no report of which has come under my observation.(*a*)

From this decision and the long series of cases in Massachusetts in which the judges have treated their attachments as being a lien, I infer that the Supreme Court of that state will give to such lien the same effect, as has been done in New Hampshire and Vermont, whenever the question is presented between the attaching creditor and the assignee in bankruptcy.

I may add, that this inference is confirmed by a recent conversation on the subject with one of the learned judges of that court.

I come now to the authorities relied upon by the general assignee, in opposition to those upon which I have just commented.

The first in order is *Ex parte Foster,* (2 Story's R. 131, and 5 Law Reporter, 55, 69,) in the Circuit Court of the United States, in the Massachusetts District. The learned judge of that circuit states the point decided in that case, when commenting upon it in the *Matter of Cook,* (5 ibid. 444, and 2 Story, 376.) He held that an attachment under the Massachusetts laws, to recover a debt, was not while the suit was pending, an absolute lien such as is protected by the act of Congress, but is a contingent lien, dependent upon the creditor's obtaining judgment in the suit. That a bankrupt discharge obtained during the progress of the suit, might be pleaded in bar, and would if properly pleaded be a good

(*a*) Reported in 7 Metcalf, 340, *Hubbard* v *Hamilton Bank.*

bar, or defence upon the merits, to the suit, and would prevent the recovery of any judgment therein. And that after the presenting a petition in bankruptcy, he would, on the application of the petitioner or of any creditor, restrain the attaching creditor from proceeding, until it should be ascertained whether the debtor would be decreed a bankrupt and discharged or not.

After the decision in *Kittredge* v. *Warren*, by the Supreme Court of New Hampshire, Judge Story, when sitting in the U. S. Circuit in that state, re-affirmed this decision, in the *Matter of Bellows and Peck*, (7 Law Reporter, 119.)

Thus that most eminent judge is placed in direct collision with the Supreme Court of New Hampshire; and if both tribunals persist in executing their judgments, a conflict of their respective executive officers is inevitable.

The doctrine of Judge Story is contrary to the opinion of Judge Thompson which I have cited, and to the principles advanced by Judge Baldwin. It is also adverse to the decisions of the U. S. District Judges in Vermont, Connecticut, Northern New York and Eastern Pennsylvania.

But the profound jurist who presides in the First Circuit of the United States, is himself a judicial host; and I rejoice that I may say of the difference between him and his late illustrious compeers, as well as that with the New Hampshire courts, *non nobis, tantas componere lites.*

Notwithstanding the marked difference which I have pointed out, between the attachments on mesne process, and the suits in our courts of equity by judgment creditors; it is not to be denied that much of Judge Story's reasoning is adverse to the lien insisted upo i in the latter suits.

Therefore, although I may perhaps rely on that difference, I feel bound to make some suggestions upon his decisions; which I nevertheless do with great diffidence.

The learned judge in the case of *Bellows and Peck*, (7 Law Reporter, 131,) finally avows that in his opinion the New Hampshire attachment is not a lien or security within the true intendment of the proviso in the second section of the bankrupt act; and if it were, it is avoided by a decree and discharge in bankruptcy, when pleaded in the attachment suit. I will dismiss the

question of lien created by the service of the attachment, by saying that the weight of authority is decisive against Judge Story. And at all events, our creditor's suit constitutes a lien or security. The more important inquiry here is the effect upon such lien of the successful prosecution of the proceeding in bankruptcy.

Judge Story holds in effect that by the discharge of the bankrupt, the debt upon which the lien is founded, is gone. And as in his view, the attaching creditor in Massachusetts or New Hampshire, can never recover a judgment because of the discharge, so here it is urged that our judgment creditor is for the same cause prevented from obtaining a decree. The argument here is clearly fallacious, unless it be a settled rule that where one proceeds in equity *in rem* as well as *in personam*, he can have no relief against the former without he shows a right to relief against the person. A suit to foreclose a mortgage, exhibits its fallacy. In truth, our creditor's suit is purely a proceeding *in rem*. It is never brought to obtain a decree against the debtor for general payment; thus merely reiterating the judgment at law.

What effect then should be given to the discharge obtained pending a suit which is both *in rem* and *in personam* ? Is the remedy against the property cut off, because the person and future effects are exonerated ?

With deference, it seems to me that it is not.

In *Newton* v. *Scott*, (9 Mees. & Welsby, 434,) in replevin, the defendant justified under a distress for rent in arrear. It appeared that the rent was due before the bankruptcy of the tenant, and the distress was made after the bankruptcy but before the tenant obtained his certificate. In behalf of the owner of the goods, (which were seised on the demised premises but did not belong to the tenant,) it was contended that by the bankruptcy and certificate, the rent was no longer due from the tenant; he was discharged of the rent. And that the discharge was in the nature of a release. Therefore the defendant was not entitled to a return of the goods.

The court decided that the certificate did not operate as a release of the rent, and that the landlord was entitled to avow for a return of the goods distrained and replevied. Parke, Baron,

said, " the only effect of the certificate is to discharge the person of the bankrupt and his (future) goods ; the debt is not thereby released, or the landlord's remedy against collateral parties extinguished. All collateral securities remain in force notwithstanding the bankruptcy, and collateral remedies are not released."

" The distress gave the landlord no *lien*, because the goods are in the custody of the law ; but he has a right to enforce the payment of the rent through the medium of the goods distrained, and as the rent·is not released by the certificate, he still retains the right to work out the payment of it by means of those goods."

This case was affirmed in the Exchequer Chamber, (present, eight judges,) 10 M. & W. 471, on the same grounds.

Lord Denman in giving the judgment of the court, says that the certificate does not extinguish the debt, but only bars the remedy.

In *Bucham* v. *Creighton*, (10 Bing. 11,) previous to the above case, the Common Pleas had held that a discharge under the insolvent debtor's act must be *pleaded in assumpsit*, on the ground that it is a statutory answer to the plaintiff's demand; it does not destroy the debt, but merely the plaintiff's remedy against the person and future effects of his debtor.

In *Phillips* v. *Sherville*, Hil. Vac. 1845, (9 Lond. Jurist Rep. 179,) the Queen's Bench held the same point upon an insolvent discharge, and referring to *Newton* v. *Scott*, Lord Denman says there is in this respect a perfect analogy between a discharge under the bankrupt act and one under the insolvent act. And although upon the latter, the remedy by action was gone, that the rent itself was not extinguished and the right of distress remained.

Is it not the same in regard to a pending attachment? The bankrupt discharge although in terms it declares the debts to be discharged, does not *extinguish the debt.* · It prevents the creditor from further pursuing the person or future acquisitions of the debtor ; but it in no manner impairs any right or interest in property which he has already acquired. This is abundantly demonstrated by Judge Pentiss in the *Matter of Reed*, before cited.

Whether the forms of proceeding in attachment suits, enable

the creditor to take a judgment so qualified, I am ignorant except as the New Hampshire decisions inform me. There is certainly no difficulty in the way of entering a decree in this court, conformable to the principle just stated.

In *Smith* v. *Gordon*, (6 Law Reporter, 313,) Judge Ware of the U. S. District Court in Maine, held that a creditor who filed a bill to reach the effects of his debtor which had been fraudulently invested in land in the name of another, did not thereby acquire any such lien or right of priority against such effects as is protected by the proviso in the bankrupt law. Judge Ware deemed the right or privilege, analogous to that obtained by the levy of an attachment, which Judge Story had adjudged not to be within the saving of the act.

The case therefore adds the approval of the learned and much respected district judge, to the decision of Mr. Justice Story. From what I have said, as well as from Judge Ware's remarks, it will be seen that the courts in this state hold differently as to the nature of the lien acquired by such a bill in equity.

After a careful examination of the judgments to which I was referred in the First United States Circuit, I am unable to concur with Mr. Justice Story and Judge Ware, in their exposition of this portion of the bankrupt act. And I must say, with the most profound respect for those eminent jurists, that I think the decided weight of judicial reasoning and authority accords with the conclusion to which I was brought by my own careful and earnest consideration of the subject.

The right of the creditor in these bills was likened by the counsel for the assignee unto the priority which the United States have by law over other creditors for the payment of debts in certain cases.

But the comparison does not hold good. The act of Congress provides that debts due to the government in the cases specified *are to be first satisfied,* where there is a deficiency of assets. It creates no lien upon any specific property. (*United States* v. *Fisher*, 2 Cranch, 358; and see 2 Wheat. 396; 1 Peters, 39 and 441, 442.) It does not impede the sale or transfer by the debtor in ordinary business; nor does it even overrule his vol-

untary assignment for the benefit of creditors. It is a mere right of prior payment out of the general funds of the debtor ; and when those funds are in the hands of his assignee, or of his legal representative, it is a right which the assignee or representative is bound to respect, at the peril of making himself personally responsible to the government. By a judgment, execution and levy it may become a lien upon specific property. If the right itself were a lien, the government could follow the property of the debtor when paid or disposed of to others, and reclaim it ; but no such remedy has ever been claimed in its behalf. So far from it, that when the question of priority arose upon an attachment levied on the debtor's personal property, before the United States issued a writ to compel payment of his bonds for duties; the Supreme Court of the United States decided that the rights acquired by the attachment were paramount. (*Prince* v. *Bartlet*, 8 Cranch, 434; *Beaston* v. *Farmers Bank of Delaware*, 12 Peters, 135.)

The case of *Conard* v. *The Atlantic Insurance Company*, (1 Peters, 386,) illustrates the nature of the priority of the United States. This case and *Thelusson* v. *Smith*, (2 Wheat. 423,) were also cited as authorities against the existence of any lien by force of a creditor's suit ; and much stress was laid upon the language of the court relative to the right of a mortgagee, and the interest of a judgment creditor in lands bound by his judgment.

Referring to Judge Baldwin's perspicuous exposition of those cases in *Dudley's Case*, before cited, (Penn. Law Journ. 313, &c.) I need only say that the point decided in each, does not affect the question before me.

Other instances of a right to priority of payment were mentioned, to weaken the force of the lien claimed in behalf of the creditor's suit. Some of them are unquestionably liens or securities within the intendment of the bankrupt act. Such is a *lis pendens* affecting a specific chattel or parcel of land. Others are mere priorities for payment ;·as a partnership debt to be paid out of partnership funds before separate debts ; and judgments to be paid before debts of a less degree, out of a decedent's estate, under our statutes of administration.

Where there is a lien, the specific property itself is affected and followed into the hands of whomsoever it may come to; while for a priority merely, if the property is disposed of without regarding such priority, the remedy is against the wrongful disposer, and not against the property itself.

My conclusion in the case of De Kay, is that Chester & Co. by the commencement and prosecution of their suit against Glover in this court, acquired a lien upon the debt due from De Kay to Glover, which was not divested or impaired by the subsequent proceedings in the bankruptcy of Glover.

The lien was acquired *by the commencement of the suit*, and not by the order for a receiver or his appointment.

In regard to chattels subject to execution, the lien may depend upon the receivership. As to that I give no opinion.

There is no dispute here as to the good faith of Chester & Co., nor but that they prosecuted their suit with diligence.

Any collusion with the debtor would doubtless defeat the lien, and in analogy to dormant executions at law, it might perhaps be lost by unexplained delay, or neglect in prosecuting the suit.

The receiver must be declared entitled to the fund in the suit of De Kay.


In the case of *Storm and others* v. *The General Assignee*, the facts material to the present inquiry are these.

Davenport, the debtor of Storm and others, on the 9th of August, 1841, assigned a bond and mortgage to Burke, for the payment of certain preferred creditors. Subsequently, Storm and others recovered a judgment against Davenport, issued an execution which was returned unsatisfied, and on the 23d of September, 1842, filed their bill thereon in this court. They made Burke a party and sought to set aside the assignment to him as fraudulent against them. The subpœna to answer, and the usual injunction, were served on the same day the bill was filed. On the 9th of November, 1842, the customary order for a receiver was made. Prior to this, and in June 1842, a receiver of Davenport's effects had been appointed in another creditor's suit, and Davenport had assigned to him, pursuant to the order of the court in that suit. The same person was appointed receiver in

the suit of Storm and others, (no other person was eligible by the practice of the courts,) but the latter appointment was made after February, 1843.

In October, 1843, the suit of Storm and others came to a hearing, and I decided that the assignment to Burke was fraudulent as against them.(a) The suit was however directed to stand over in order to make the general assignee a party. While the original suit was pending, and on the 24th of January, 1843, Davenport filed his petition for a discharge under the bankrupt act, and he was decreed a bankrupt on the 25th day of February following.

It is contended by the general assignee, that the assignment by Davenport to Burke was a fraud upon the bankrupt act, and void as against the assignee, who by virtue of the decree in bankruptcy, is entitled to claim and receive the mortgage as a part of Davenport's assets.

He also insists that the decree took effect by relation from the time of filing the petition in bankruptcy; but that point is not material in this suit.

The fraudulent assignment was made before the bankrupt act passed. It can scarcely be said to have been a fraud upon a statute not then in being. It was more properly a fraud upon our statute against fraudulent sales and conveyances, and any judgment and execution creditor was at liberty to avoid it for that cause.

Waiving this consideration for the present, was the assignment affected by the bankrupt act?

The second section declares that *future* transfers, &c., in contemplation of bankruptcy, &c., shall be deemed a fraud on the act, and void. This transfer was a transaction passed; it was not future, whether the act be deemed to speak from its passage, or from the time it went into effect.

After the second proviso in the same section, it is enacted that no bankrupt shall be discharged on his voluntary petition, who has made an assignment after the 1st of January, 1841, in con-

(a) Reported, ante, Vol. I., page 135.

templation of the passage of the act, by which preferences are given.

This is similar to the provision in our state insolvent laws, and is to be construed in the same manner. It does not avoid or affect the assignment, although it precludes the assignor from availing himself of the benefit of the insolvent laws.

But if I am wrong in this, and the effect of the clause is to render the assignment of Davenport void; yet the very next sentence is the proviso which has engaged my attention in De Kay's case, and which declares that nothing in the act contained shall impair any liens, or securities, &c., valid by the state law, and not inconsistent with the second or fifth sections of the act.

In this case, before any proceeding was had in bankruptcy, Storm and others had obtained a lien upon the mortgage which is directly within that proviso.

The good sense of the matter in my view is this.

The bankrupt, before the act passed, made a transfer which was fraudulent as against creditors. But until some creditor proceeded in equity to avoid it, it was operative, and transferred the mortgage in question. It was voidable in respect of Storm and others, and subsequently became voidable by the general assignee. By our law, the first creditor who assailed it in due form, would obtain a lien upon it, and a priority over other creditors.

Storm and others were the first who proceeded against it, and they acquired such a lien and priority over all the other creditors, before the general assignee had any rights; and indeed before there was any proceeding in bankruptcy taken, or (so far as appears,) contemplated. Although the general assignee, upon the decree in bankruptcy became the representative of all the creditors and entitled to assail the assignment, yet he could not on filing a bill, assert any other or greater rights, than all the creditors could for whom he was a representative. And all the other creditors combined, could not overreach or impair the prior right of Storm and others obtained by the commencement of their suit.

If the property assigned to Burke had been merchandize, and Storm and others had levied upon it by virtue of their execution before the petition in bankruptcy was presented, their lien would

have prevailed indisputably, over the title of the general assignee. The commencement of the creditor's suit gave them an equitable lien upon the mortgage in question, which is as efficacious as the levy of an execution upon merchandize, and in my judgment equally within the saving of the bankrupt act.

If the assignee were to be entitled to a preference over Storm and others under these circumstances, it would present this singular anomaly, that no creditor could file a bill to avoid a transfer palpably fraudulent, without incurring the risk of losing all his trouble and expenses after an angry contest, by the fraudulent debtor's voluntarily going into bankruptcy.

I do not think that the true construction of the act of Congress leads to any such result; and I have no doubt but that Storm and others are entitled to the priority which they clearly had at the commencement of their suit.

The funds in these cases, are in the custody of the officers of this court, and as I entertain no doubt in regard to the right of the complainants in the creditors suits, I will make the usual decree for their payment. Whenever a proper case arises, I trust to be found emulating the lofty tone and the generous confidence, exhibited by the able judge of the Southern District Court, in the case before cited. (*In re Coster*, 1 N. Y. Leg. Obs. 58.)

Decree accordingly, in both suits.